# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KIM L. HARGETT. SR.,         *

Plaintiff                  *

v                        *         Civil Action No. JFM-16-1739

L. ARMSTEAD, *et al*.,      *

Defendants           *
                         ***

## MEMORANDUM

Pending are motions to dismiss, or, in the alternative, for summary judgment filed by defendants Commissioner of Correction Dayena Corcoran, Warden Laura Armstead, and Chantell Sessions, ("correctional defendants") (ECF 11) and by Wexford Health Sources, Inc., ("Wexford"), Andrew Moultrie, M.D., and Oladipo Olaleye, R.N.P.[1] ("medical defendants"). ECF 14. Plaintiff has filed an opposition (ECF 22[2]) to which defendants have replied. ECF 23 & 24. The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, defendants' motions, construed as motions for summary judgment, shall be granted.

### Background

A.    Complaint Allegations

Plaintiff Kim L. Hargett, Sr., a state inmate confined at the Patuxent Institution in Jessup, Maryland, filed the instant verified complaint on May 31, 2016. ECF 1, p. 1. He alleged that in June of 2015, he began to feel pain in his right calf and knee. ECF 1, p. 2. He submitted a sick call slip and was seen by Oladipo Olaleye, R.N.P. who prescribed Motrin for pain relief. *Id.* He

---

[1] The Clerk shall amend the docket to reflect the full and complete names of defendants.

[2] Plaintiff's complaints regarding his post-surgery care, raised for the first time in his opposition response, are not properly before the court and shall not be considered.

was again seen by Oleleye in July of 2015. At that time he was advised that there was nothing Olaleye could do for him and he should talk to Dr. Moultrie. *Id.* Moultrie asked plaintiff who sent him to his office and conferred with Olaleye, who then advised plaintiff there was nothing they could do. *Id.*

Plaintiff wrote an administrative remedy complaint ("ARP") in August of 2015, concerning the pain in his right knee and calf, but the ARP was denied. ECF 1, p. 3.

Moultrie evaluated plaintiff in September of 2015 during a chronic care visit. Plaintiff explained that he was in excruciating pain and Moultrie suggested plaintiff undergo an x-ray. *Id.* On September 24, 2015, plaintiff was called to see Moultrie. Plaintiff inquired about the x-ray to which Moultrie did not respond. Plaintiff states that he let Moultrie know he was upset and still needed an x-ray. Moultrie then got upset and plaintiff was placed on administrative segregation. *Id.*, p. 3. Plaintiff states that he was subsequently found not-guilty at the ensuing adjustment hearing. *Id.*

In November of 2015, plaintiff received the x-ray which showed a bullet lodged in the back of plaintiff's right knee. *Id.* Plaintiff was seen by a general surgeon in December of 2015 who suggested that plaintiff see a neurosurgeon. *Id.* Plaintiff saw the neurosurgeon on January 19, 2016. The neurosurgeon suggested plaintiff undergo a CT scan to determine the bullet's location to develop a plan to remove it. *Id.* As of the filing of plaintiff's complaint he had not received the CT scan. *Id.*

On March 4, 2016, plaintiff was called to the chronic care clinic where Moultrie advised he would receive a Telemedicine appointment. *Id.* At the time of the filing of the complaint that had not occurred. Plaintiff reported that he was in excruciating pain. *Id.*

Plaintiff sought compensatory and punitive damages as well as injunctive relief directing the removal of the bullet fragment from his knee. As indicated below, the bullet has been surgically removed and as such, plaintiff's request for injunctive relief is moot.[3]

B.    Medical defendants

Medical defendants offer plaintiff's pertinent medical records as well as an affidavit from Dr. Temesgen in support of their motion. ECF 14-4 (medical records); ECF 14-5 (Temesgen affidavit).

The undisputed records demonstrate that plaintiff has a medical history of chronic pain syndrome, muscle spasm and osteoarthritis of the knees. ECF 4-4.

Plaintiff was seen on June 1, 2015, by Almon Baptiste, LPN, for a chronic care visit. *Id.*, p. 2. Plaintiff denied any chronic pain since his last encounter. *Id.* That same day he was seen by Andrew Moultrie, M.D. *Id.*, pp. 3-4. Moultrie noted that plaintiff suffered from chronic left shoulder pain that was helped with Neurontin. *Id.* Examination showed left shoulder pain with and without palpation. Mild tenderness of the cervical spine was also noted. *Id.* Plaintiff's non-formulary prescription for Neurontin was renewed. *Id.* p. 5.

On June 24, 2015, plaintiff was seen for an urgent provider visit due to a cut on his hand. *Id.*, p. 6. The cut had minimal bleeding and plaintiff requested a band –aid. He otherwise denied any pain. *Id.*

Oladipo Olaleye, R.N.P., evaluated plaintiff on July 29, 2015, for a provider sick call. *Id.*, p. 7. At that time plaintiff reported pain to the right leg and calf. He stated that the pain began six months earlier and was increasing in intensity. *Id.* He also reported more pain at rest and in the calf area. No swelling, warmth or redness were observed. It was noted that he had good +2

---

[3] Where injunctive or declaratory relief is requested in an inmate's complaint, it is possible for events occurring subsequent to the filing of the complaint to render the matter moot. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (transfer of prisoner moots his Eighth Amendment claims for injunctive and declaratory relief).

pedal pulses to dorsalis pedis and posterior tibial and popliteal pulse. Plaintiff was advised that the pain was possibly nerve pain. Plaintiff disagreed, advising he had circulation problems and wanted to be treated. It was noted that plaintiff had been non-compliant with his Neurontin prescription and was advised to take the medication as prescribed. No skeletal tenderness or joint deformities were observed. Plaintiff's extremities appeared normal and no edema or cyanosis was noted. *Id.*

Plaintiff was again seen by Olaleye on August 8, 2015, at sick call. *Id.*, pp. 9-11. Plaintiff continued to complain of pain in the left calf that had started two weeks earlier and offered that he thought he had peripheral artery disease ("PAD"). Plaintiff reported that the pain was worse at rest. No swelling, redness, or skin discoloration was observed. Good +2 pedal pulses were noted. There were no signs of arterial or venous disorders. Plaintiff was advised to take Neurontin consistently every 12 hours. Plaintiff refused and it was noted that his records indicated he had been noncompliant with his pain medication in the past. Olaleye discussed plaintiff's condition with the onsite physician. *Id.*

On August 28, 2015, plaintiff was seen by Khadijat Adebayi, R.N. for complaints of chest paint. *Id.*, pp. 12-13. Plaintiff reported throbbing pain in the chest diagonally from the mid-upper shoulder to the sternum. The pain was described as non-radiating and 5 on a 10 point scale. He was observed in no acute distress. His chest was clear to auscultation and his heart rate was regular and sounded normal. No edema was observed. Dr. Singh was notified and it was determined that emergency services were not necessary. *Id.*

Plaintiff was evaluated by Almon Baptiste, L.P.N. for a nurse chronic care visit on September 1, 2015. He reported no symptoms relative to his chronic pain or medication. *Id.*, p. 14. On September 3, 2015, plaintiff's prescription for Neurontin was renewed. *Id.*, p. 15.

4

Moultrie evaluated plaintiff on September 24, 2015, for follow-up of right knee, hip and ankle pain. *Id.* pp. 16-17. Plaintiff reported that his prescribed medications did not work; however, the Neurontin was helping his lower left extremity pain. *Id.* Plaintiff's prescription was changed from an NSAID to Mobic and a muscle relaxer was also prescribed. *Id.* Moultrie placed an order for x-rays of the knee and hip. *Id.*

Plaintiff's x-rays were delivered to medical staff on November 4, 2015. Id., p. 18. Mild degenerative changes were noted bilaterally in the hip joints. Bullet fragments were present on the posterior aspect of the right knee. *Id.* No acute fractures, dislocations or subluxations were observed. *Id.*

On November 10, 2015, plaintiff was seen by Olaleye at provider sick call. *Id.*, pp. 19-20. He reported pain in the right lower leg of 7/10 and advised that he did not want any more medication but wanted the bullet removed. *Id.* Olaleye advised plaintiff that this condition would be discussed with his provider to determine a plan of action. Olaleye recommended plaintiff be referred to the onsite surgeon for evaluation and the consultation request was placed. *Id.*, p. 21.

Plaintiff was again seen by Olaleye on November 17, 2015. *Id.*, pp. 22-23. Plaintiff inquired as to the plan for removing the bullet fragments and reported that he did not want any more pain medication. *Id.* The LPN/RN indicated plaintiff might be acting for secondary gain as he had been observed running quickly up two staircases going down, but limping back up. *Id.* Plaintiff was advised that the consultation request had been placed for a surgery evaluation and he needed to wait for the evaluation before any further plans would be made. *Id.*

On November 25, 2015, plaintiff failed to appear of his morning medication. *Id.*, p. 24. From November 25, 2015 to April 27, 2016, plaintiff failed to appear for his morning medication on 44 occasions. ECF 14-4, pp, 24, 25, 27, 28, 30, 35, 38-41, 44, 49-55, 61, 62, 67, 68, 79-82,

86-93. He also failed to appear for evening medications on a number of occasions. *Id.*, pp. 25, 45.

Plaintiff was seen on November 30, 2015, by Patience Muson, L.P.N. for a chronic care visit. *Id.*, p. 29. He reported no chronic pain symptoms or complications with medications. *Id.*

The following day plaintiff was seen by Moultrie in the chronic care clinic for pain in the left foot and right knee. *Id.*, pp. 31-34. Plaintiff reported that the medication helped the left foot pain but not the right knee pain. He complained of cramping in the right leg and stated that he wanted the bullet fragments behind the right knee removed if possible. *Id.* Plaintiff was advised that he was being referred to the general surgeon for evaluation as to whether than extraction was indicated. *Id.* Plaintiff's NSAID prescription was changed to Lodine and his Robaxin prescription was increased to help with pain relief. *Id.* No tenderness to palpation of the right lower extremity inferiolateral popliteal area was noted. No edema, erythema, or masses were observed. *Id.*

On December 3, 2015, plaintiff was seen via telemed conference by Olaleye, Moultrie, and the regional medical director Kasahun Temesgen, M.D. *Id.*, p. 36. Plaintiff was approved for surgical evaluation and was referred to be seen by Mohammad Saleem, M.D. upon the doctor's return from vacation. *Id.*, p. 37.

Plaintiff was seen by Olaleye at a provider sick call on December 15, 2015. *Id.*, pp. 42-43. At that time, plaintiff reported that he bullet fragments had been there for 23 years. *Id.* He was advised that he was approved to have a surgery evaluation when the surgeon returned from vacation. He was again educated on the need to be compliant with his pain medication and it was again noted that he was frequently non-compliant. *Id.*

Plaintiff was evaluated by Dr. Saleem on December 23, 2015. *Id.*, pp. 46-47. It was noted that plaintiff had restricted movement in his right knee. The knee was mildly tender and no superficial bullet was palpable. *Id.* Plaintiff was referred to orthopedics for further evaluation. *Id.*, pp. 46-48.

On January 18, 2016, plaintiff was seen by RNP Olaleye at provider sick call. *Id.*, pp. 56-57. Plaintiff's history of bullet fragments in the right knee for 21 years was noted. It was observed that plaintiff had pain with range of motion in the right knee. No swelling was noted. His non-compliance with his Robaxin and Etodolac medications was also discussed and plaintiff agreed to have these medications discontinued. *Id.* Olaleye emailed the scheduler to follow-up on plaintiff's evaluation with orthopedics. *Id.*

The following day, plaintiff was seen by Lawrence A. Manning, M.D. for an onsite orthopedic consultation. *Id.*, p. 58. Plaintiff reported he suffered a gunshot wound 21 years ago. He stated he had pain in the entire right thigh and leg a year ago. Indocin, Mobic and Robaxin did not help his pain. He reported pain primarily in the right knee. *Id.* Examination showed a well-developed, well nourished, male in no acute distress. He ambulated without an assistive device but with a limp. Plaintiff had a full range of movement in the right knee. No effusion of the knee, ligamentous instability, or tenderness was observed. *Id.* Review of the right knee x-ray showed a bullet in the popliteal space just lateral to the midline. Manning suggested a CT scan of the right knee in order to evaluate the position of the bullet in relation to the knee capsule and neurovascular structures. *Id.* He suggested discontinuing plaintiff's Indocin prescription and starting Mobic 7.5 mg every day after meals for two weeks; and if no improvement to increase the Mobic to 15 mg every day after meals *Id.* Manning suggested plaintiff return to him after the

CT results were available. A radial x-ray of the right knee with one/two views was also ordered. *Id.*

The x-rays were taken on January 20, 2016, and showed a posterior bullet fragment. *Id.*, p. 59. No evidence of an acute fracture, dislocation, or subluxation was noted. *Id.* Narrowing of the medial compartmental joint space with tibial peaking and marginal osteophytes was also observed. The radiologist's impression was that there was no acute disease with some degenerative joint disease. *Id.*

On February 11, 2016, plaintiff was seen by Olaleye at provider sick call for follow up regarding his knee pain. *Id.*, pp. 63-64. It was noted that the orthopedist recommended a CT scan and a consultation request was placed. *Id.*, p. 65. A non-formulary request for 7.5 mg of Mobic was also placed and approved. *Id.*, p. 66.

Plaintiff was evaluated by Moultrie on March 4, 2016, during a provider chronic care visit. *Id.*, pp. 70-72. Plaintiff reported receiving some relief from taking 7.5 mg of Mobic. *Id.* The Mobic dose was increased to 15 mg daily and Neurontin was continued. *Id.*, pp. 73-74.

A note was entered on March 6, 2016, that the recommendation for a CT scan of plaintiff's right knee was submitted to the regional medical director for review by plaintiff's collegial team. *Id.*, p. 75.

Plaintiff was provided a knee brace on March 9, 2016. *Id.*, p. 76.

On March 22, 2016, plaintiff reported during a provider sick call that his pain medication as ineffective and requested stronger medication. *Id.*, pp. 77-78. It was determined by Emmanuel Esianor, P.A. that plaintiff was on adequate medication and was referred to the chronic care physician. *Id.*

Plaintiff failed to appear for a nurse practitioner sick call on April 12, 2016. *Id.*, p. 83. Two days later plaintiff was seen by Olaleye at provider sick call. Id., p. 84. He inquired as to when he would get a CT scan. Olaleye emailed the regional medical director to review the case. *Id.*

Plaintiff was again seen by Olaleye on April 29, 2016. *Id.*, pp. 94-95. Plaintiff's continued non-compliance with medication was discussed. Plaintiff was informed that the regional medical director was to review the recommendation for a CT scan in the next week and that the CT scan was not yet approved. *Id.* Plaintiff became irate, shouted and threatened Olaleye. *Id.*

On May 23, 2016, plaintiff as seen by Moultrie at chronic care clinic. Id., pp. 97-98. He reported that his pain was not helped by Mobic. Plaintiff's prescription was changed to Salsalate. *Id.* Plaintiff expressed concern that the CT scan had not been approved and Moultrie advised that he would bring the CT recommendation to the regional medical director's attention. Moultrie also discussed with plaintiff using Cymbalta for pain relief. *Id.* Plaintiff's prescription for Neurontin was renewed. *Id.*, pp. 99-100.

The regional medical director reviewed plaintiff's right knee condition on June 9, 2016. *Id.*, pp. 101-102. It was recommended that plaintiff's pain medications be changed to Naproxen and Elavil. *Id.* Plaintiff was approved to have the bullet fragments surgically removed and he was educated regarding use of the knee brace. *Id.* A consultation request for surgery with Dr. Hannah was placed. *Id.*, p. 103.

On July 7, 2016, plaintiff was seen by Olaleye. *Id.*, p. 105. He inquired as to the next steps after his interview with Dr. Hannah. Olaleye advised plaintiff he would email the

scheduler to determine which surgeon would perform the surgery. *Id.* A request for a CT scan, which Dr. Hannah, had requested on June 30, 2016, was placed. *Id.*, p. 106.

The results of the CT scan were received on August 1, 2016. Id., p. 107. The scan showed a metallic foreign body consistent with an intact bullet located in the posterior soft tissues. *Id.* The bullet was in fatty tissue adjacent to the lateral aspect of the semimembranosus muscle, proximal 1.5 cm from the posterior skin. *Id.* The biceps femoris muscle was noted as further lateral with the peroneal nerve and the tibial nerve deeper and lateral to the bullet. *Id.* The results of the CT scan were reviewed by Olaleye with plaintiff on August 15, 2016. *Id.*, p. 110. A consultation request for surgical removal of the bullet was placed on August 11, 2016. *Id.*, p. 109.

Plaintiff underwent a pre-operation physical on August 16, 2016, and was cleared for surgery by Olaleye. *Id.* pp. 111-112. Surgery was performed on August 18, 2016, at Bon Secours Hospital to remove the bullet behind the right knee. *Id.*, pp. 113-118. Dr. Krishnaswamy reported the bullet was located and removed. The wound was irrigated with saline solution, sutures were applied, and the skin stabled. *Id.*

After surgery, plaintiff was transferred to the Jessup Regional Infirmary for post-operative care. *Id.*, p. 119. An ace wrap dressing was applied the right knee and plaintiff was able to ambulate with crutches. His knee was elevated and ice applied. The dressing was to be changed every 3 days. *Id.* Plaintiff remained in the infirmary for skilled nursing care until August 24, 2016. *Id.*, pp. 120-126.

Plaintiff was discharged from the infirmary on August 24, 2016, and returned to Patuxent Institution where he was evaluated by Moultrie. *Id.*, pp. 127-128. Plaintiff reported changing his

dressing the night before. He also reported he was in pain form the surgery but was otherwise in stable condition. He reported walking long distances was an issue. *Id.*

Regional Medical Director Kasahun Temesgen, M.D. avers that plaintiff's medical condition was carefully evaluated by health care providers and plaintiff was evaluated by two separate surgeons regarding the bullet lodged in his knee. ECF 14-5, ¶ 6. Temesgen avers that the surgeons recommended a CT scan if surgery was to be performed but it was not clear whether surgery was necessary as plaintiff had the bullet in his leg for over two decades without apparent complaint. *Id.*

Temesgen further avers that plaintiff was frequently non-compliant with pain medication which interfered with the effectiveness of the medication and cast bout whether plaintiff's reported knee pain was real or was for secondary gain. *Id.* Additionally, plaintiff had been seen by medical staff ambulating without indication of pain. *Id.*

Temesgen states that foreign objects located in the body can move over time due to the body's movements or muscle motion and may irritate nerves or damage vessels. *Id.*, ¶ 7. He avers that sometimes the body encloses bullets around a small cavity and forms a harmless granuloma. *Id.* Rarely, the bullet may corrode and release metal ions which may cause allergic reaction or poisoning. *Id.*

Ultimately, plaintiff's condition was evaluated by medical staff in collegial review and Temesgen made the decision that the bullet should be surgically removed, which occurred. *Id.*, p. ¶ 8. Temesgen avers that in his opinion, to a reasonable degree of medical probability, plaintiff received appropriate treatment of his right knee pain and removal of the bullet. *Id.*, ¶ 8. Plaintiff continues to be seen regularly in the chronic care clinic and to have access to medical staff. *Id.*

C.     Correctional Defendants

Sharon Baucom, M.D., Director of Clinical Services for the Maryland Department of Public Safety and Correctional Services ("DPSCS) avers that she does not practice medicine or provide direct medical care to Division of Correction ("DOC") inmates. ECF 11-2, ¶ 1. The State of Maryland through DPSCS has contracted with Wexford to provide direct health care services and utilization management for inmates. *Id.*, ¶ 3. Baucom avers that DPSCS's Secretary and Wardens have no personal involvement in the provision of medical care to any Maryland inmate. *Id.*, ¶ 5. Moreover they have not authority to make decisions concerning any inmate's medical care. *Id.* Baucom has no supervisory authority over private medical contractor's staff. *Id.* ¶ 6.

Request for special off-site consultations are made by Wexford's Medical Director independent of DPSCS. *Id.*, ¶ 9. If a request is not approved and is appealed, Wexford would request Baucom as DPSCS's Chief Medical Officer review the case and make a recommendation, which would be final, regarding the conflict. *Id.*

ARP requests concerning allegations of inadequate medical care are referred to an employee of Wexford to conduct an investigation and make a recommendation. *Id.*, ¶ 14. If the inmate appeals the decision at the facility level the ARP appeal is reviewed by a masters or equivalent experience level nurse from the Office of Inmate Health Services, a DPSCS employee. *Id.* Baucom does not personally review ARPs. Wardens are expected to rely upon the reports, assessments, and judgment of the medical site contractor's trained staff in their response to the ARP. *Id.*

Warden Armstead avers that she has no authority make decisions concerning any inmate's medical care to order the contractor's medical staff to take any particular medical action. ECF 11-3, ¶ 4. When responding to an inmate's complaint regarding medical care,

Armstead and her staff rely upon the reports, assessments and judgment of the contractor's trained medical staff to prepare any responses. *Id.*

Plaintiff filed an ARP (PATX 1075-15) complaining that a bullet had been found in his right knee and was trying to find out when it would be removed. ECF 11-4, pp. 13-24. After an investigation, Armstead responded on December 30, 2015, advising plaintiff that he had been seen by medical and was approved for a surgical evaluation. *Id.*, p. 14. He was advised he could submit a sick call slip. *Id.*

Plaintiff filed an appeal to headquarters. *Id.*, pp. 3-12. The investigation was assigned to the Office of Inmate Health Services. *Id.*, p. 12. Sessions advised plaintiff of the 15 day extension of time for the Commissioner to respond to the appeal. *Id.* p. 11. Investigation showed plaintiff had been evaluated by medical and that x-rays showed plaintiff did not have an acute problem. *Id.*, p. 9. Medication was ordered for pain and inflammation management and it was noted that plaintiff had been non-compliant with the taking of medications. A CT scan of plaintiff's knee had been ordered to evaluate the position of the bullet. Plaintiff was advised to continue to work with medical. P.A. Moore, the Commissioner's designee responded to the complaint. Moore found that he appeal was meritorious in part in that the Warden did not adhere to the established time frame for providing a response to the ARP. *Id.*, p. 5.

Sessions avers that she had no personal involvement in the provision of medical care to any inmate and has no authority to make decisions concerning any inmate's medical care. ECF 11-5, ¶ 4. She avers that she did not interfere with, hinder, or delay, medical treatment or care to plaintiff. *Id.*

## Standard of Review

**A.     Motion to Dismiss**

13

The purpose of a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's Complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require Defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 563. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

**B.    Motion for Summary Judgment**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## Analysis

A.    Supervisory Liability

To the extent plaintiff intended to hold correctional defendants and Wexford liable as supervisors, his claim fails. It is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no *respondeat superior* liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Where, as here, a plaintiff points to no action or inaction on the part of supervisory defendants that resulted in a constitutional injury, the claims against supervisory personnel must be dismissed.

B.    Medical care

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized

16

by statute and imposed by a criminal judgment." *De Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences. . . . To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839- 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995)

quoting *Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169 (Actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier*, 896 F.2d at 851. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U. S. 825, 837 (1994). Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). Mere negligence or malpractice does not rise to a constitutional level. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986).

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977). The record evidence indicates that plaintiff's requests were considered and her needs were addressed. The fact that every request for medical tests was not approved does not reflect deliberate indifference. To the extent some of plaintiff's complaints have gone unaddressed, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Plaintiff's grievances with the medical decisions made regarding what tests and treatments are necessary in light of the symptoms presented are reflective of his frustration, but "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849(4th Cir. 1985), citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir.1970). There are no exceptional circumstances alleged in this case.

Plaintiff first complained of knee pain in July of 2015. The bullet which had then been lodged in plaintiff's knee for over 20 years was first identified by x-ray in November of 2015. Thereafter, plaintiff was seen regularly by onsite medical staff. He was provided pain medications which were adjusted regularly based upon plaintiff's representation of pain management. Despite the efforts to provide pain relief and plaintiff's complaints, he was regularly non-compliant with taking pain medication. Plaintiff was provided a knee brace. He was evaluated by surgical and orthopedic specialist providers. A CT scan and additional x-rays were taken. He was approved for surgical removal of the bullet which occurred in August 2016- -thirteen months after he first complained of knee pain and nine months after discovery of the bullet in his knee. After the discovery of the bullet, plaintiff was monitored and additional

diagnostic testing and referral to specialists was undertaken to determine whether the bullet required removal. Plaintiff's claim is nothing more than disagreement with the medical providers' assessment of the urgency of his care. The nine month delay while plaintiff underwent additional diagnostic procedures and consultations before surgery occurred does not demonstrate a deliberate indifference to plaintiff's serious medical needs. An "inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Hill v. DeKalb Regional Youth Detention Center*, 40 F. 3d 1176, 1188 (11th Cir. 1994). Plaintiff has failed to allege, must less evidence of any detrimental effect occasioned by the alleged delay. Plaintiff's mere disagreement with the speed in which his medical providers acted is insufficient to demonstrate deliberate indifference. *See Wright*, 766 F.2d at 849.

To the extent plaintiff complains that he was prescribed various medications and treated like a "lab rat" (ECF 22), his claim also fails. Efforts of plaintiff's medical providers to adjust his medication to provide pain relief refutes plaintiff's claim of deliberate indifference. The undisputed record evidence demonstrates that medical provides made good faith efforts to properly treat plaintiff's condition. They are entitled to summary judgment.

The complaint does not allege any personal participation by correctional defendants in regard to the alleged denial of medical care. Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Other than being named in the caption of the complaint, the correctional defendants are not mentioned anywhere in the factual allegations in regard to the denial of medical care. Plaintiff does not attribute any action or inaction to any of the named correctional defendants that resulted in his being denied constitutionally adequate medical care. Simply

stated, plaintiff's allegations fail to state a claim against correctional defendants for an Eighth Amendment violation based on deliberate indifference to a serious medical need.[4]

## CONCLUSION

For the foregoing reasons defendants' dispositive motions, treated as motions for summary judgment, will be GRANTED and judgment will be ENTERED in favor of defendants and against plaintiff. A separate Order follows.

_August 10, 2017_
Date

_J. Frederick Motz_
J. Frederick Motz
United States District Judge

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 AUG 10 AM 11: 32

CLERK'S OFFICE
AT BALTIMORE

BY _____ DEPUTY

---

[4] Having found no constitutional violation, the court need not address defendants' claims of qualified immunity.